**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 18-20989-CR-ALTMAN(s)**

**UNITED STATES OF AMERICA**

**vs.**

**RAOUL DOEKHIE,** *et al.***,**

      **Defendants.**

_____/

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

In 2017, a small organic food company discovered the Defendants' fraud after a carrier reported that goods intended for Suriname were instead being delivered to a U.S. customer's warehouse. <u>See</u> Jan. 22, 2020 Trial Tr. at 409-10, 443. Nabi asked Grobman why the company suddenly refused to do business with them (<u>see</u> GX 2H). Grobman explained:

> We have worked 12 years+ with minimal issues, we should be fortunate about it. I understand every time we lose some line, it affects us all, but this is out of control, that a driver talks, these are the kind of morons that elected our current president.

(<u>Id.</u>) Nabi replied: "UNDERSTOOD, LET'S WORK HARDER FOR MORE LINES AND ORDERS" (<u>id.</u>) (emphasis in original).

For 12 years+, the Defendants worked hard at defrauding U.S. businesses both large and small. The truth, in the form of an honest truck driver or a well-hidden GPS device, was their primary obstacle. And for 12 years+, they mostly succeeded: "As a part of the scheme, the conspirators created fake documents and devised fraudulent shell companies, which they used to trick the manufacturers into believing that the products had been shipped to Suriname—when, in fact, Grobman was selling the products in the United States" (Detention Order [ECF No. 417] at 2). In short, the Defendants' scam was an affront; not only to the 50+ victims but to anyone who has ever tried to earn an honest living.

For 12 years+, the Defendants thoroughly enjoyed their fraud proceeds: a $9 million waterfront home in Golden Beach, a three-bedroom condominium on Las Olas, another three-bedroom condominium in Rotterdam, luxury cars, private schools, international vacations, and the 48-foot yacht Grobman sold in June (pictured below, parked behind his house).[1]



---

[1] We know almost nothing about Doekhie and Nabi's properties in Suriname, because they do not say (see Doekhie PSI [ECF No. 377] ¶¶ 95-97). Grobman likewise refuses to disclose the extent of his real estate holdings (Grobman PSI Add. [ECF No. 403-1] at 1). During the scheme, he managed "Taly Investment Properties LLC," which remains active according to Florida Division of Corporations records (Grobman PSI [ECF No. 378] ¶ 97). Following his conviction, Grobman became a member of that entity and his wife became the sole manager (see Florida Div. of Corp., *Taly Investment Properties LLC Annual Filing (June 30, 2020)*, attached hereto as Exhibit 1).

To this day, the Defendants continue to conceal the fruits of their scam.[2] But there is no hiding the fact that it made them rich. As the Court already observed, Grobman "has access to extraordinary wealth and resources" (Detention Order at 3). And Doekhie previously admitted that his fraudulent company had a net worth of $28,000,000.00 (Doekhie PSI ¶ 95). This exorbitant wealth was not earned; it was swindled.



---

[2] Apparently, Grobman also continues to operate his fraudulent businesses, including Nutrisource (the entity named in the summary chart above). (See Florida Div. of Corp., *Nutrisource I, LLC Annual Filing (June 30, 2020)*, attached hereto as Exhibit 2) (adding Grobman's wife as "manager" and changing Grobman's title to "member"). (See also Grobman PSI ¶ 105) ("It remains unclear as to how the defendant and his wife support their household expenses without income as neither the defendant nor his wife disclosed this information").

(GX 12B-3). The Defendants have long maintained that theirs was not a "traditional" fraud scheme (see Grobman PSI Obj. [ECF No. 475] at 26). They are right in some respects; their crimes were far more lucrative than run-of-the-mill securities or even health care frauds.[3]

They were also more brazen. These Defendants did not tout penny stocks or submit inflated bills to Medicare. They invented a fake government agency. They replaced Suriname-bound baby food with sheetrock and barbed wire. Grobman bought his yacht through a Delaware shell company named "Baby Formula LLC." And Doekhie's self-proclaimed "Mission Statement" was "[**t]o conduct all operations in an ethical manner while contributing to the building and strengthening of our communities and country**." (Tropical Marketing & Distribution, *Business Profile* at 3, available at http://www.tropicalgroupnv.com/BusinessProfileTMD2011.pdf (emphasis added).[4] Of course, the Defendants' real mission was to line their pockets.

The question, then, is what sentence properly accounts for the Defendants' greed? It is not life imprisonment (see Doekhie PSI ¶ 108). It is also not merely ten years—the unjustifiably lenient sentence imposed on Byramji Javat, who pled guilty in his case. See United States v. Javat, No. 18-20668-CR-Middlebrooks (S.D. Fla.) (discussed infra). Certainly it is not close to the sentence imposed on co-defendant Edgar Torres, who accepted responsibility and testified against the

---

[3] See U.S. Sentencing Comm'n, *Quick Facts: Health Care Fraud Offenses (FY 2018)*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Health_Care_Fraud_FY18.pdf (noting median loss amount of $1,048,375.00); id., *Quick Facts: Securities and Investment Fraud Offenses (FY 2018)*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY18.pdf (noting median loss amount of $2,580,271.00).

[4] The Government has also attached Tropical Marketing & Distribution's Business Profile as Exhibit 3. Notably, it lists Doekhie's personal e-mail address as the point of contact for the company (see id. at 1).

criminals who recruited, directed, and supervised him. See United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009) ("defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial").

In our response to the Defendants' PSI objections ([ECF No. 483]), we discussed why their properly-calculated offense level is 43, even using a highly conservative loss amount (see id. at 10-13). Undoubtedly, the Section 3553(a) factors compel a lengthy prison term. And the ultimate sentence should not minimize the seriousness of the Defendants' decade-long fraud simply because they ripped off for-profit companies.

In sum, the Government seeks significant punishment for each of the orchestrators of this criminal enterprise. See Feb. 4, 2020 Trial Tr. at 2829. Such a sentence will send a strong message to the Defendants and other commercial fraudsters who are in the business of lying for money. It will also make clear that corrupt international firms like Tropical Marketing & Distribution are not immune from prosecution in the U.S. The Defendants' scheme lasted 12 years+. They should spend far more time in Federal prison.[5]

### Basic Principles

After United States v. Booker, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not

---

[5] Because they may be eligible for an international treaty transfer to Holland, Doekhie and Nabi could end up serving just a fraction of their sentence in the U.S. And Holland is under no obligation to enforce the terms of this Court's sentence. See 18 U.S.C. §§ 4100-4115.

discuss each of these factors in either the sentencing hearing or in the sentencing order." United

States v. Amedeo, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some

factors than others. See United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009).

### Punishment for Sophisticated, Wealthy Criminals

The Eleventh Circuit has said "economic and fraud-based crimes" are "more rational, cool,

and calculated than sudden crimes of passion or opportunity," and thus "prime candidate[s] for

general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing

Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary

L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress

recognized "the critical deterrent value of imprisoning serious white collar criminals, even where

those criminals might themselves be unlikely to commit another offense[.]" Martin, 455 F.3d at

1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Eleventh Circuit also observed that

"[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white

collar crime therefore can be affected and reduced with serious punishment." Martin, 455 F.3d at

1240 (emphasis added).[6]

This Court should not be moved by the Defendants' rote suggestion that the Guidelines are

unfair to "first-time, nonviolent" offenders (see Grobman Obj. at 16 n.5). Most wealthy defendants

fit that description. Here, the Guidelines already account for the fact that the Defendants were not

---

[6] That is precisely what happened here. The jury saw how the Defendants performed cost-benefit analyses when deciding whether to continue scamming certain victims. (See GX 1GM-P) (Nabi asking Grobman to comment after a victim company told Tropical Marketing & Distribution about new steps they were taking to combat diversion); (GX 1GM-N) (Nabi asking Grobman whether the risk was worth the reward when forwarding him an e-mail about measures a company was taking to prevent diversion of products); (GX 2P) (Nabi asking Grobman for advice following Eden Foods' detection of their fraud).

caught until 2018. See U.S.S.G. § 4A1.1. And Federal law punishes thieves of all kinds; whether they steal through violence or deception. The fraud Guidelines uniquely operate to promote the sentencing goals of Section 3553(a). Through the loss table, and other specific offense characteristics such as number-of-victims and sophisticated-means, Section 2B1.1 operates to assist courts in fashioning a sentence that will "reflect the seriousness of the offense, promote respect for the law, and . . . provide just punishment for [an] offense," 18 U.S.C. § 3553(a)(2)(A).

The evolution of the Fraud guidelines is worth noting. In 2001, for example, the Commission promulgated an amendment as part of an "economic crime package," which represented not only the first overhaul of a major Guideline, but one of the most public and transparent amendments to date. See Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History ("Economic Crime")*, 35 Ind. L. Rev. 5, 7-8 (2001). This amendment was the result of a six-year-long effort to gather information, hold hearings, and create an amended sentencing regime that remedied deficiencies that had come to light in prior versions of the Guidelines. Id. The Commission sought input from the defense bar, the Department of Justice, Probation Officers, the Criminal Law Committee of the Judicial Conference ("Judicial Conference"), and academic commentators. Id. at 7. What emerged was a complete overhaul of Sections 2B1.1 and 2F1.1, remedying perceived problems that had existed since the implementation of the Guidelines. Specifically, the 2001 economic crime package consolidated Sections 2B1.1 and 2F1.1, revised the loss table to afford higher punishments for high-loss offenders and re-defined the term "loss" to avoid the ambiguity that had previously made it "one of the most commonly litigated issues in federal sentencing law." Id. at 26. In all, this redrafting of a major crime category—one that accounted for up to 20% of federal sentences—

was unprecedented in its breadth and process. Id. at 8. In fact, the economic crime package of 2001 has been described as "the first federal sentencing reform initiative in the guidelines era to have been conducted in the public eye from its inception." Id.

Furthermore, the economic crime package was not the result of a Congressional directive, but rather of a lengthy fact-finding mission to respond to comments from the Department of Justice and the Judicial Conference, among others, that "the offenses sentenced under the guidelines . . . under-punish individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." U.S.S.G. App. C, Amdt. 617 (emphasis added). Much has been written on why that is. See, e.g., Jennifer Taub, *Big Dirty Money: The Shocking Injustice and Unseen Cost of White Collar Crime* (2020) at 135 ("The rich can go practically unpunished, unless their crime is so glaring. . . . the poor have to receive the penalty of their offense in every instance") (internal quotation marks omitted).

In 2015, Section 2B1.1 was again updated in a way that re-affirmed the empirical approach of the fraud Guidelines. First, the Commission adjusted the loss tables according to the "gradual decrease in the value of the dollar over time." See U.S.S.G. Supplement to App. C, Amdt. 791 at 109. Although not specifically re-visiting the theory behind the loss tables, the Commission observed that "previous Commissions engaged in careful examination (and at times, a wholesale rewriting) of the monetary tables and ultimately included monetary and enhancement levels that it considered appropriate at that time." Id. at 110. The Commission also adjusted aspects of the enhancements for number of victims, intended loss, sophisticated means, and loss related to fraud on the market. See U.S.S.G. Supplement to App. C, Amdt. 792 at 110-114. As the Commission explained:

This amendment makes several changes to the guideline applicable to economic crimes, §2B1.1 (Theft, Property Destruction, and Fraud), <u>to better account for harm to victims, individual culpability, and the offender's intent</u>. This amendment is a result of the Commission's multi- year study of § 2B1.1 and related guidelines, and follows extensive data collection and analysis relating to economic offenses and offenders. Using this Commission data, combined with legal analysis and public comment, the Commission identified a number of specific areas where changes were appropriate.

<u>Id.</u> at 112 (emphasis added).

In short, Section 2B1.1 is a carefully-considered and oft-adjusted effort by the Commission to reach empirically sound sentences for sophisticated, white-collar criminals. The Defendants' inevitable attempts to discredit the fraud Guidelines as arbitrary or unduly punitive should not persuade.

<u>The Statutory Factors</u>

The relevant Section 3553(a) factors are discussed below. In broad strokes, these factors compel the Court to impose a severe sentence in this case. As noted, the Defendants' international fraud scheme was long-running and brazen. This was not a series of bad business decisions or willful blindness; it was a concerted, deliberate, and cynical campaign.

A.      **The nature and circumstances of the offense.** <u>See</u> 18 U.S.C. § 3553(a)(1).

As noted, the nature and circumstances of the Defendants' scheme demand a severe punishment. They were convicted of smuggling baby formula—plus a slew of traditional white-collar crimes. Despite this, the Defendants have stridently maintained their scam was "just business." <u>See, e.g.</u>, Jan. 22, 2020 Trial Tr. at 343 ("And this, then, is a case about business. It's not a case about fraud."); Feb. 5, 2020 Trial Tr. at 3419 ("Because this is not a fraud case; it's a business case. This is not the courtroom where this case belongs."); <u>id.</u> at 3420 ("Johnny Grobman sits here wrongfully accused of a variety of crimes for doing his business, for engaging in a lawful

Page 9 of 22

business."). Even now, the Defendants contend "[t]his case was about gray market and the diversion of products." (Nabi Sent. Mem. [ECF No. 490] at 2).

The jury was not fooled. They saw how frequently the Defendants lied to victims, the exhaustive steps they took to conceal the truth, and the expansion of the scam year after year. Many of the Defendants' lies were egregious. Their creation of a fake government agency in an impoverished country was especially galling. As Candice Khan explained, she believed her company's baby formula "was supplied to the government. . . , who would then, uhm, have made the product available at their health clinics for consumers. So, consumers could come to the clinic, go to visit their doctor, **and receive product at a nominal value at that same health clinic, which would cover their monthly requirement for their infant.**" Jan. 27, 2020 Trial Tr. at 1357-58 (emphasis added). In truth, Grobman was selling that baby food in the U.S. for a massive profit (see GX 12B-3, GX 1MJN-58). The Defendants' scheme was abhorrent.

It was also dangerous. The Defendants ignored the public health risks involved with removing food and medicine from the legitimate supply chain. Setting aside the risks of stuffing baby formula and barbed wire into the same shipping container, there is no dispute that most of the products they pilfered were regulated by the FDA. When such products are obtained through fraud, the manufacturers' ability to conduct effective recalls is thwarted. See Jan. 24, 2020 Trial Tr. at 1023 (Bray acknowledging Mead Johnson did not know how much baby formula was diverted by the Defendants). These risks are real. So much so that Federal law and the Guidelines specifically sanction criminals who obtain pre-retail medical products, including baby formula, by fraud or deceit. See U.S.S.G. § 2B1.1(b)(8)(A) ("[i]f (A) the offense involved conduct described

in 18 U.S.C. § 670, increase by 2 levels"). The Defendants ignored these risks in pursuit of bigger profits.

By way of example, Alcon sent in 2018 the following e-mail to Tropical Marketing & Distribution: "We need you to send us the data of the temperature sensors. These sensors were sent together with the products. . . . **Remember that you are an important part of the safe handling of cold chain products**. The information from the sensors guarantees that the product reaches our patients in the best conditions and, above all, ensures the quality of them. **We recommend keeping the products in quarantine, until we evaluate the sensor data**." (See GX 1STO-DD) (emphasis added). Nabi responded with her usual mendacity: "As we had such a backlog in shipments from Novartis, the goods were distributed immediately by the Tender Office upon arrival, without keeping the Coldtech boxes. We are sorry but we do not have access to these label sensors anymore" (id.) Of course, the goods were never distributed by the fictional Suriname Tender Office; they were re-sold in the U.S. by Grobman (see, e.g., GX 1ALCON-I, GX 1ALCON-G, GX 8C). In other words, as a result of the Defendants' scam, Alcon could not know whether its medical products were handled safely.[7]

Additionally, pursuant to the Public Health Security and Bioterrorism Preparedness Response Act of 2002, importers must submit prior notice to the FDA of food, including baby formula, which enters the U.S. See Pub. L. 107-188; 21 U.S.C. § 381(m). Advance notice of imported food shipments allows the FDA to effectively target import inspections and helps protect the food supply against public health emergencies. In this case, the Defendants committed even

---

[7] The Court may have noted that Doekhie is prescribed Alcon-brand eye care products while in jail (Doekhie PSI ¶ 89).

more fraud to avoid FDA inspections of "U-turned" baby formula (see Superseding Indictment [ECF No 132] at 7). In May 2018, Grobman wrote:

> Ok BUT, lets change this invoice so it does not show 4 cases of an item they will inspect fda.
>
> Just take them out and we will move them before inspection to another load. Not worth the hassle.

(GX 1MJN-50) (emphasis in original).

Lastly, the Defendants' scam hurt the victims in a real way. The Defendants stole over $140,000,000.00 of these companies' profits. See United States v. Ali, 620 F.3d 1062, 1073 (9th Cir. 2010) (rejecting characterization of victim's loss "as only the expectation of potential profits") (internal quotation marks omitted). See also United States v. Simon, No. 3:14-CV-2025, 2016 WL 3597579, at *12 (N.D. Ind. July 5, 2016) ("[p]ersuasive authority from other circuits . . . uniformly holds that a defendant who lies about his eligibility for a discount deprives his victim of a property right in the full price of the good or service bought"). As noted, the mere fact that the victims are companies does not nullify their losses. Nor does it support undue leniency. The victim businesses are made up of their employees—real people whose livelihoods depend upon the company's financial health. They are accountable to their stakeholders. And, unlike these Defendants, they cannot simply cheat their way to prosperity.

For example, the jury heard testimony from Jay Hughes of Eden Foods, a 50-year-old company that "pioneered the term 'organic.'" Jan. 22, 2020 Trial Tr. at 385. Eden Foods has about 140 employees; it's headquartered in a small town called Clinton, Michigan. Id. Hughes testified that if Eden Foods gave "export prices" to every distributor who sold in the United States, "[w]e'd

be out of business within the year." <u>Id.</u> at 481. Eventually, Hughes saw the Defendants' con for what it was: "outright fraud, period." <u>Id.</u> at 443.

Allison Medical is a family-run Colorado business that sells disposable medical equipment (including insulin syringes and other products for diabetics). Allison's CFO wrote a letter to the Probation Office after learning about the Defendants' convictions. (<u>See</u> Allison Medical Victim Let.) (attached hereto as Exhibit 4). The letter explains how the Defendants' scheme cost Allison sales to one of its best customers (<u>id.</u> at 1-2). It also cost people their jobs. (<u>Id.</u> at 2) ("In 2019, due to the loss of the diverted products we were forced to lay off several employees and it has taken over 6 years to recover from fraudulent companies diverting [Allison Medical] product").

Of course, the Government recognizes that the financial harm caused by the Defendants' fraud was mitigated somewhat by the types of victims they targeted. But the jury's verdict required a finding that the Defendants purposefully sought to harm these companies. <u>See</u> Feb. 5, 2020 Trial Tr. at 3321-22 (instructing the jury on the "intent to defraud" element of wire fraud). That harm had a measurable impact—above and beyond the $140 million in victim losses (<u>see</u> Exhibit 4 at 2).

In this district, such conduct results in very long prison sentences. It does not matter whether the victim is Medicare, the I.R.S., banks, or individual investors. <u>See, e.g.</u>, <u>United States v. Moran</u>, 778 F.3d 942, 975 (11th Cir. 2015) (affirming 30-year sentence for ringleader of $11.5 million health care fraud following a jury trial before Judge Scola); <u>United States v. Mateos</u>, 623 F.3d 1350, 1367 (11th Cir. 2010) (affirming 30-year sentence for doctor in $11 million health care fraud following a jury trial before Judge Moreno); <u>United States v. Rabuffo</u>, 716 F. App'x 888, 906 (11th Cir. 2017) (affirming 20-year sentences for mortgage fraudsters based on $50 million

losses to banks following a jury trial before Chief Judge Moore); United States v. Wilmore, 625 F. App'x 366, 369 (11th Cir. 2015) (affirming 20-year sentence for identity thief who caused $2.9 million loss to I.R.S. following a jury trial before Judge Scola); United States v. Kerns, 336 F. App'x 916, 918-19 (11th Cir. 2009) (affirming 20-year sentence for leader of market manipulation scheme following jury trial before Judge Marra); United States v. Esformes, 16-20549-Cr-Scola (S.D. Fla. 2019) (sentencing health care fraudster to 20 years' imprisonment despite a discounted loss amount of $4-8 million).

Even if this Court were to set aside some part of the victims' actual losses, the first Section 3553(a) factor still mandates a sentence that properly accounts for the Defendants' corrupt intent. At sentencing, the Court should weigh both the Defendants' greed and the financial impact on the victims.[8] Furthermore, the Court must fashion a sentence that reflects the extraordinary longevity of this 12 years+ scheme. A decade in prison will not do.

**B.      The history and characteristics of the Defendants. See 18 U.S.C. § 3553(a)(1).**

On balance, the history and characteristics of the Defendants do not support a life sentence; but they do not require leniency, either. As the Court said of Grobman, "he has demonstrated a callous willingness—over many years—to defraud others and to disregard the law when doing so

---

[8] It bears noting that the financial impact on even the largest victims in this case is still greater than most health care fraud schemes. Medicare, for example, is a $700 billion program. See Medicare.gov, *How Is Medicare Funded?* available at https://www.medicare.gov/about-us/how-is-medicare-funded (last accessed Oct. 18, 2020).

was in his own best interests" (Detention Order at 13). As much as the Defendants will dispute this at sentencing, their crime came to define them.

Like most con artists, the Defendants were at their worst when confronted. After Eden Foods caught the Defendants in 2017, Grobman blamed the truck driver who, in his view, snitched (GX 2H). Later, he casually forged documents to evade FDA inspections of baby food (he considered them a "hassle") (GX 1MJN-50). When Domino Sugar uncovered forged export paperwork (GX 5A), Nabi responded indignantly: "We sell 90% to the Govt and if opportunity is there we sell to 3rd party customers, as was the case with this one load. We do not have any other proof [of export] for you, apart from the fact that ALL went to Suriname" (GX 1Domino-O) (alteration added; emphasis in original). At times, she demanded that victims lower prices by pretending the "Tender Office" had rejected their initial bids (see 1STO-Z). Many of Doekhie's worst lies were reduced to writing. After years of scamming victims, he executed multiple contracts promising not to sell products outside Suriname (see, e.g., 1Alcon-A, 1MJN-112). Doekhie also signed a letter assuring Alcon that the Tender Office was the "Government of Suriname" (GX 1Alcon-M).

The Defendants knew it was wrong. (See GX 2C) ("Eden Foods provides special pricing to our Export customers. . . . Diversion of product intended for Export is disruptive and damaging. Purchasing product under the pretext of Export and then selling it domestically is dishonest"); (see also 1GM-P) (stating the Defendants' diversion scheme was costing victim DeMet's Candy Company "a lot of time and money").

Yet they persisted in this fraud for 12 years+. It is easy to see why. Without it, Grobman could not live in a $9 million home. Nor could he make yearly contributions to his children's

private school and other donations he now cites as a basis for leniency (Grobman PSI ¶ 105).

Grobman's neighbor and close friend says he has "anonymously given to and taken care of

individuals in our community who have fallen on hard times" ([ECF No. 435-1]).[9]  Normally, such

charity is commendable. But Grobman's contributions to Golden Beach's underprivileged (and

the attendant tax breaks) are derived from fraud. As the same friend noted, Grobman was first to

volunteer his home for school functions (id.). That too was swindled, not earned.

    In other words, it is easy to be charitable with other people's money. Grobman's only

employment since 2001 was with the companies he used to effectuate his scam (Grobman PSI ¶

96). Unfortunately, it appears he continues to run those companies post-conviction—in his wife's

name (see Exhibit 2). Obviously, a rich man's donations or good works do not erase 12 years+ of

fraud. As the Fourth Circuit observed:

> To allow any affluent offender to point to the good his money has performed
> and to receive a downward departure from the calculated offense level on that basis
> is to make a mockery of the Guidelines. Such accommodation suggests that a
> successful criminal defendant need only write out a few checks to charities and then
> indignantly demand that his sentence be reduced.
>
> The very idea of such purchases of lower sentences is unsavory, and
> suggests that society can always be bought off, even by those whose criminal
> misconduct has shown contempt for its well-being.

United States v. McHan, 920 F.2d 244, 248 (4th Cir. 1990). More recently, Judge Scola sentenced

a wealthy Medicare fraudster to twenty years' imprisonment following a lengthy presentation

about his charitable works. Esformes, No. 16-20549-CR-Scola. See also United States v.

---

[9] Setting aside his charitable endeavors, many of the hundreds of letters from family and friends
stress Grobman's faith and his virtues as a father and husband. The Court should of course take
those qualities into consideration. But it is unlikely that the writers ever witnessed Grobman's
callousness as a businessman (see Detention Order at 13).

Masferrer, 514 F.3d 1158, 1164-65 (11th Cir. 2008) (affirming 30-year sentence for a wealthy bank fraud defendant known widely in this community for his charity). In sum, Grobman is not the first or last wealthy defendant to seek mercy from a sentencing judge based on his stolen largesse. Grobman is not Robin Hood. It would be an insult to those who give from their lawfully-earned paychecks to reduce Grobman's punishment significantly on this basis.

Doekhie and Nabi, meanwhile, sought primarily to enrich themselves and their family. Their company's profile boasts:

> We represent brands that are internationally recognized, we therefore go the extra mile to provide those brands with the marketing investment and support they need in the market. The ethical pharmaceutical division generating [sic] Suriname US$25 million in sales annually, plays a prominent role in the country's health care system.

(Exhibit 3 at 4). In reality, they diverted food and medicine away from their impoverished country—for cash. Doekhie and Nabi also corrupted family members through their scheme—of the ten-plus employees at their $28 million company, Nabi's son and brother were both involved in the fraudulent business (see Gov't Resp. to PSI Obj. at 30, 33). It is unsurprising that Nabi's character references include two unindicted co-conspirators (Nabi Sent. Mem. at 6). And despite telling the Probation Office that they spent much of their time in the condo they own in Holland, Doekhie and Nabi now say his mother is the owner (id. at 35). As noted, Doekhie and Nabi say nothing at all about their assets in Suriname, whose flag and seal they exploited.

In that vein, it appears none of the Defendants has any interest in paying restitution to their victims. Or even a fine. To date, and despite Grobman's charity and plea for acceptance-of-

responsibility credit (Grobman Obj. at 25-27), the Defendants continue to hide their true wealth from the Court. The Probation Officer notes:

> During the presentence investigation interview, [Grobman's] defense counsel advised bank account statements and tax records regarding the above-mentioned employment would be forwarded to the probation officer.

(Grobman PSI ¶ 96). Apparently not. (See Grobman PSI Add. at 1) ("to date, the defendant has failed to provide any financial statements").

Finally, the Defendants' criminal history is already accounted for in the Guidelines. Their "first-time offender" status means little given their 12 years+ crime. In short, their history and characteristics do not move the needle.

### C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and general deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B).

As noted, the Defendants have consistently sought to deny or minimize their criminal culpability. Pre-trial, Grobman demanded "the government must again be required to identify a crime other than one that Congress has not outlawed, but the Southern District of Florida apparently has." (See Grobman Resp. to Gov't 404(b) Mot. [ECF No. 126] at 11-12). In retrospect, this is prattle. The jury found the Defendants violated five different federal statutes. Their scheme showed an utter lack of respect for both the law and the truth. It harmed victim companies and their employees. It put the public at risk. It was motivated by greed.

The Defendants' crimes also illustrate the dangers of "off-shoring" criminal activity. In short, they were able to avoid detection by pretending to do business in a developing country— while at the same time enjoying South Florida luxuries, bank accounts, and limited liability companies. Worse still, the victims in this case will now question whether customers in the

developing world (1) actually need baby food and medicine; or (2) are like the Defendants. That is a pernicious result. A severe sentence in this case is more likely to deter other international fraudsters. At a minimum, and given their wealth and prominence in Suriname, a serious penalty in this case will help ensure nobody steps up to take Doekhie and Nabi's place.

Of course, a long sentence will send an even stronger message to fraudulent diverters like Grobman. Those individuals will be forced into a more difficult cost-benefit analysis; the threat of imprisonment surely outweighs the threat of lawsuits. See Martin, 455 F.3d at 1240. By contrast, a lenient sentence would only embolden these scammers. They, like the Defendants, probably rationalize their conduct as "just business."

### D. Specific deterrence. See 18 U.S.C. § 3553(a)(2)(C).

This factor does not move the needle, either. On one hand, it appears that the threat of long-term incarceration has effected some change. For example, Doekhie and Nabi's company has apparently taken down its website (see http://www.tropicalgroupnv.com/about_us/) (last accessed Oct. 19, 2020). That means victim companies will be less likely to engage if solicited by other employees of Tropical Marketing & Distribution. This prosecution further allowed the Government to seize the operating accounts for several of the Defendants' fraudulent companies (in the U.S. at least) (see Grobman PSI ¶ 99).

On the other hand, Grobman and his associates are apparently still in business. According to corporate and other business records, Nutrisource is a going concern (see, e.g., Exhibit 2). As are several other fraudulent companies (Grobman PSI ¶ 97) (listing, among others, Medisource IV LLC and Savico Wholesale LLC). In some cases, Grobman simply moved the companies into his wife's name (see Exhibits 1, 2). As noted, and despite his lawyers' assurances, he refuses to turn

over his bank records (Grobman PSI ¶ 96). For now at least, Grobman's indictment, conviction, incarceration, and upcoming sentencing have not motivated him to change. The Government cannot predict whether a severe sentence will deter him and his accomplices. However, we can say with near-certainty that a lenient sentence will not.

E.    **The applicable Sentencing Guidelines and unwarranted disparities. See 18 U.S.C. § 3553(a)(4), (6).**

The rationale and validity of the fraud Guidelines are addressed above and at length in the Government's response to the Defendants' PSI objections. We write separately, however, to address a comment made by Judge Middlebrooks in the Javat case. There, the court sentenced the mastermind to ten years' imprisonment based, in part, on Judge Middlebrooks' view that Section 2B1.1 "was not based on empirical evidence." See United States v. Javat, No. 18-20668-CR-Middlebrooks, Order on Sentencing ([ECF No. 459]) at 10 (S.D. Fla. Dec. 17, 2019). The government objected to that decision, which is surely not the correct outcome here.

First, as a matter of law, Javat is distinguishable from these Defendants. In Javat, the lead defendant pled guilty. In this case, the Defendants shamelessly pointed the finger at the victims, the Government, Torres, and eventually each other. See Docampo, 573 F.3d at 1101. Second, despite questioning the application of Section 2B1.1, Judge Middlebrooks nevertheless correctly calculated the Guidelines. In Javat, the court found the potential loss amount was between $25,000,000 and $65,000,000—based on what Javat and his co-conspirators should have paid for product. Javat, No. 18-20668-CR-Middlebrooks, Order on Sentencing at 2, 7. In this case, we have asked the Court to calculate the Guidelines based on the victims' sworn loss declarations and testimony (see Gov't Resp. to PSI Obj. at 6-10). Third, as discussed in detail above, we respectfully disagree that the fraud Guidelines overstate the seriousness of this offense. Section 2B1.1 is

uniquely suited to address the duration, intent, and sophistication of the Defendants' scheme. Fourth, although the scams were similar, Judge Middlebrooks did not have an expansive trial record to shine light on the elaborate con; only one defendant (a customs broker) actually went to trial in that case. As noted, Javat took a plea. This Court, by contrast, has a lengthy trial record that showed the extent of both the scheme and the orchestrators' greed. The Court also saw how quickly the jury rendered its verdict on every charged count. They had no trouble deciding that the Defendants' conduct was criminal.

For all these reasons, Javat's 10-year sentence is not a benchmark. If anything, this Court should view Javat as a cautionary tale. Post-sentencing events in Javat's case serve as a stark reminder why undue leniency for wealthy white-collar defendants is unfounded. Crooks like Javat, and the Defendants here, built vast fortunes by lying, cheating, and scamming. They know no path to riches other than flouting the law and the truth; they will not suddenly reform after receiving the Court's mercy. To wit: since his sentencing, Javat has violated multiple Court orders; been compelled over his objection by Judge Middlebrooks to produce discovery about his still-hidden assets; refused to pay one cent of the millions in restitution due and owing to his victims (which Judge Middlebrooks ordered to be paid immediately); refused to pay one cent of a $26 million forfeiture order; and is currently facing a contempt motion that may lengthen his time in prison. Javat is a lesson for what will happen should this Court show unfounded leniency.

## Conclusion

Critically, these Defendants do not deserve such leniency. They ran their brazen fraud scheme for 12 years+. Justice requires a punishment much longer than that.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:  /s/ *Christopher Browne*
Assistant United States Attorney
Shannon Shaw
FL Bar No. 92806
Christopher Browne
FL Bar No. 91337
John Shipley
FL Bar No. 0069670
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street, Suite 400
Miami, FL 33132-2111
Telephone: 305-961-9374
E-mail: Shannon.shaw@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 19, 2020, the foregoing document was filed with the Clerk of the Court using CM/ECF.

/s/ *Christopher Browne*
Assistant United States Attorney