# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 18-20989-CR-ALTMAN/Goodman

**UNITED STATES OF AMERICA**,

    *Plaintiff*,

*v.*

**JOHNNY GROBMAN**, *et al.*,

    *Defendants.*

_____/

## ORDER

After a two-week trial, a federal jury convicted our Defendants—Johnny Grobman, Raoul Doekhie, and Sherida Nabi—of a scheme to defraud the manufacturers of certain FDA-regulated products. The Defendants negotiated steep discounts from the victim companies by promising to redistribute the victims' products *abroad*, when in fact they intended to sell those goods in the United States at a substantial mark-up—a business practice known as diversion. They concealed their scheme by, among other things, inventing a fictitious Suriname Tender Office, fabricating purchase orders, surreptitiously re-routing (or "U-turning") "foreign" shipments, filling "dummy" cargo containers with sheetrock, and falsifying export documents.

In their motion for a new trial, the Defendants advance two arguments. *First*, they contend that, although the indictment charged them only with "fraud in the inducement," the Government improperly introduced extraneous (and, in their mind, irrelevant) evidence of "post-contract" fraud. In doing so, the Defendants say, the Government constructively amended the indictment (or, at least, materially varied from it). Along similar lines, they suggest that the Court's legal instructions allowed the jury to find them guilty on either of two theories of criminal liability: fraudulent inducement or "post-contract" fraud—the latter of which (they insist) hadn't been charged.

We're not persuaded. The indictment unambiguously described, in substantial detail, many of the "post-contract" activities that (the Defendants now say) should have been inadmissible at trial—a reality that belies the Defendants' variance contentions. Trying to parry this result, the Defendants fixate—much as they did at trial—on the indictment's allegation that, "from the outset," they intended to re-sell the victims' products in the United States. Because of this allegation, the Defendants maintain, the Government should have been limited to introducing only evidence of *pre*-contract activity.

Not so. By alleging that the Defendants intended to defraud their victims "from the outset," the indictment made clear that their criminal intentions were dynamic and continuous—that they manifested themselves, in other words, *both* at the beginning of the scheme *and* thereafter. That allegation didn't work some illogical alteration in the basic elements of a wire-fraud scheme, and it certainly didn't prevent the Government from introducing the very acts of concealment and misdirection that comprised the essential ingredients of that "scheme."

*Second*, the Defendants contend that the Government procured false testimony about the fake "purchase orders" they were generating from the fictitious governmental entity that, as part of their fraudulent scheme, they had invented. In their view, an employee from one of the victim companies testified that his company had first obtained these fake purchase orders more than a decade before—even though the Defendants didn't begin to generate those orders until much later. According to the Defendants, this "false" testimony led the jury to believe (incorrectly) that they had used the purchase orders "from the outset" to inveigle the victim companies into the scheme.

The Defendants misread the transcript. The employee never said—as the Defendants now suggest—that his company had *always* maintained the purchase order in question (or others like it) in its files. He surmised only that the company *would have* kept such a document in the ordinary course of its business. But he was clear that he didn't know when that particular purchase order was first

entered into the company's computer system or whether the company had seen it when it first began negotiating with the Defendants.

More fundamentally, the Defendants don't deny that, before trial, the Government gave them the very same documents that (they now say) should have alerted the Government to the employee's mendacity. The purported falsity of that testimony thus should have been obvious to them *when it happened*—which is reason enough to reject their request for a new trial. In any case, the Defendants had as much time as they needed to cross-examine the employee. What they want now, then, is a *second* go at him—a kind of do-over that, generally speaking, the law doesn't permit.

But all of this is really beside the point. The Defendants' basic premise, remember, is that the employee must have been lying about seeing the purchase order because *the Defendants* hadn't yet drafted it. They seem to be suggesting, in other words, that the Government had some obligation to tell them a "truth universally acknowledged"[1]: that a document *they* created didn't exist *before* they created it. *Giglio* doesn't require the Government to instruct our Defendants on the Laws of Cause and Effect. The Motion is **DENIED**.

## BACKGROUND

In December of 2018, a federal grand jury returned an Indictment [ECF No. 1] against Doekhie, Grobman, Nabi, and a fourth confederate, Edgar Torres. Torres later pled guilty and agreed to cooperate with the Government. *See* Torres Plea Agreement [ECF No. 96]. His assistance led to a Superseding Indictment [ECF No. 132] in August of 2019.

### I.    THE SUPERSEDING INDICTMENT

The Superseding Indictment alleged that the three remaining Defendants had engaged in a scheme to buy FDA-regulated consumer goods, drugs, and medical products at considerably

---

[1] JANE AUSTEN, PRIDE AND PREJUDICE 1 (1813).

discounted prices. *Id.* at 5–6. They obtained these discounts by falsely telling the goods' manufacturers and suppliers (the "victim companies") that they intended to distribute the products *solely* outside of the United States. *Id.* But the Defendants, "*from the outset*, intended to, and did, sell those goods, drugs, and medical products at a substantial profit to wholesalers, distributors, and others in the United States." *Id.* at 6, 9 (emphasis added).

According to the Superseding Indictment, the Defendants carried out the conspiracy—from March of 2013 to December of 2018, *id.* at 5—as follows: Doekhie and Nabi presented themselves as officers of Tropical Marketing & Distribution N.V., a business based out of Suriname, *id.* at 3–4. The pair then created a website for a fictional entity called the "Suriname Tender Office" to support their false misrepresentation that they had a government tender for the victim companies' products. *Id.* at 6. After the victim companies sold them the products at discounted prices, the Defendants would arrange—in contravention of their promises to the companies—to sell those products in the United States. *Id.* at 7. Often, they would ship the products abroad and then immediately bring them back (a practice called "U-turning"). *Id.* When they would U-turn products back into the United States, Grobman would submit false documents to U.S. Customs agents, and Doekhie and Nabi would direct Torres to falsify shipping documents, which they would then send to the victim companies. *Id.* On other occasions, the Defendants would, after selling the products directly in the United States, cover up the fraud by exporting "dummy" shipments to the foreign port. *Id.* In either scenario, Grobman and Torres would sell the products in the United States and remit some portion of the substantial profits back to Doekhie and Nabi. *Id.* at 7–8.

Count 1 of the Superseding Indictment charged Doekhie, Grobman, and Nabi with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. *Id.* at 5. Counts 2–9 charged the Defendants with eight instances of substantive wire fraud, in violation of 18 U.S.C. § 1343. *Id.* at 8–11. Counts 10–20 charged them with laundering the proceeds of their unlawful scheme, in violation of 18 U.S.C.

§ 1957. *Id.* at 12–13. Count 21 charged them with Conspiracy to Obtain by Fraud and Deception Pre-Retail Medical Products, in violation of 18 U.S.C. § 670(a)(6). *Id.* at 14–15. Counts 22–29 charged Doekhie and Nabi with Theft of Pre-Retail Medical Products, in violation of 18 U.S.C. § 670(a)(1). *Id.* And Counts 30–31 charged all three Defendants with illegal smuggling, in violation of 18 U.S.C. § 554. *Id.* at 15.[2]

## II.   MOTION TO DISMISS THE SUPERSEDING INDICTMENT

Before trial, the Defendants moved to dismiss Counts 1–10 and 20–29,[3] arguing that the Superseding Indictment failed to allege the first element of wire fraud—which, in their view, required "*contemporaneous* fraudulent intent from the inception of the contractual relationship between [the victim companies] and Tropical." Motion to Dismiss [ECF No. 208] at 2 (emphasis added); *see also id.* at 4 (claiming that "the Government must prove fraudulent intent at the time of contract execution; evidence of a subsequent willful breach cannot sustain the claims"). The Superseding Indictment failed in that regard, the Defendants said, because it described only "post-contractual events occurring between March 2013-December 2018." *Id.* at 7–10. The Defendants added that, in any event, they *couldn't* have had the requisite contemporaneous intent because, while they ultimately redistributed the products in the United States, they didn't *always* intend to do so. *Id.* In essence, the Defendants claimed that they had negotiated the contracts in good faith, that they thus hadn't fraudulently induced the victims into the contractual relationships, and that they couldn't be punished under criminal statutes for deciding (much later on) to breach those contracts. *Id.*

In a detailed and well-reasoned Omnibus Report & Recommendation ("R&R") [ECF No. 249], the Magistrate Judge (Jonathan Goodman) recommended that this Court deny all three motions

---

[2] In other words, Doekhie and Nabi were charged in Counts 1–9, 18–19, and 21–31, and Grobman was charged in Counts 1, 2, 8–9, 10–17, 20–21, and 30–31.
[3] The Defendants filed two other motions to dismiss—*see* Motion to Dismiss Counts 1–20 [ECF No. 209]; Motion to Dismiss Counts 30–31 [ECF No. 210]—which aren't relevant here.

to dismiss. On the claim that the Superseding Indictment failed to allege contemporaneous intent, Judge Goodman distinguished the Defendants' main case, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016), by pointing out that it involved a post-trial challenge to the sufficiency of a civil plaintiff's evidence and didn't test the facial sufficiency of a criminal indictment. *Id.* at 7. The legal principle the Defendants derived from *O'Donnell*—that "the common law does not permit a fraud claim based solely on contractual breach"—was beside the point. *Id.* (quoting Motion to Dismiss at 4). The Superseding Indictment didn't charge "breach of contract," as the Defendants suggested; it alleged that they had engaged in "a *series* of ongoing misrepresentations over the course of five to six years that occurred 'outside of any contractual arrangement.'" *Id.* at 8 (cleaned up).

As for the Defendants' contention that they really didn't intend to mislead the companies *from the outset*, this was simply a question of fact for the jury. Because the Government represented that it *could* prove fraudulent intent—in part by using circumstantial evidence of *post*-contractual behavior— the Magistrate Judge saw no need to test the sufficiency of the Government's evidence *before* trial. *Id.* at 9; *see also* Dec. 4, 2019 Goodman Hr'g Tr. [ECF No. 246] 74:21–24 ("THE COURT: Page 6 of the superseding indictment. From the outset. So your position is we do have such evidence and we intend to introduce it at trial, correct? MR. BROWNE: Yes.").

In their objections to the R&R, the Defendants reiterated their position that "the Government failed to allege any facts establishing fraudulent intent *at the inception* of the relationship with [the victim companies]." Objection to R&R [ECF No. 258] at 3. They claimed, too, that the victim companies didn't (as a matter of fact) impose territorial restrictions on Tropical—the implication being that the victims had *authorized* the Defendants to sell their products in the United States. *See id.* at 3–4.

At the hearing on the motions to dismiss, we explained that: (1) *O'Donnell* was inapposite; (2) the Superseding Indictment had, in fact, alleged that the Defendants' intent to defraud "was present

from the outset of the [contractual] relationship[s]" with the victim companies; and (3) the Superseding Indictment *did not* assail the Defendants for breaching a contract but, instead, charged "a whole host of misrepresentations" *outside* the contractual arrangements. Jan. 13, 2020 Hr'g Tr. [ECF No. 295] 9–12. On the Defendants' argument that the Superseding Indictment involved only conduct from 2013 to 2018, we reiterated the well-established rule that post-hoc behavior could serve as compelling circumstantial evidence of contemporaneous criminal intent. *Id.* at 12. We therefore adopted the R&R in full and denied the motions to dismiss. *See* Omnibus Order [ECF No. 292].

## III.   THE JURY INSTRUCTIONS

In anticipation of trial, the parties submitted their proposed jury instructions. As relevant here, the Defendants asked the Court to instruct the jury that "[a] contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution," and that "[t]he proper time for identifying fraudulent intent is contemporaneous with, that is at the time of the making of the promise, not when a victim relies on the promise or is injured by it." Joint Jury Instruction [ECF No. 297-1] at 39. Here, again, they cited *O'Donnell* for the proposition that, "to find fraudulent intent, the Government must prove beyond a reasonable doubt at the time Tropical entered into any contract with the Company[,] Tropical had no intention to perform an obligation of the contract," and that "[a] contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution." Defendants' Theory of Defense Jury Instruction [ECF No. 284] at 6; *accord* Defendants' Proposed Theory of Defense Jury Instruction [ECF No. 330] at 2.

We rejected the Defendants' proposal. *See generally* Court's Instruction to the Jury [ECF No. 337]. Instead, we used the following language, taken *verbatim* from the Eleventh Circuit's pattern jury instructions:

> A "scheme to defraud" means any plan or course of action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses,

representations, or promises. . . . To act with "intent to defraud" means to act knowingly and with the specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury. The Government does not have to prove all the details alleged in the superseding indictment about the precise nature and purpose of the scheme. It also doesn't have to prove that the material transmitted by interstate wire was itself false or fraudulent; or that using the wire was intended as the specific or exclusive means of carrying out the alleged fraud; or that the Defendant personally made the transmission over the wire. And it doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone.

*Id.* at 12–13; *accord* Eleventh Circuit Pattern Crim. Jury Instr., O51 (Wire Fraud) (2020).

## IV.   THE TRIAL

And so, the trial came. In their opening statements, the Defendants maintained[4] that they had never intended to defraud the victim companies—though they conceded that they ultimately decided to breach their contracts with the victims. They also suggested that, while the Superseding Indictment alleged a conspiracy from 2013 to 2018, the evidence would establish arrangements between Tropical and the victim companies dating back to 2008—when Tropical was buying products from the companies through *ad hoc* purchase orders, rather than formal contracts. *See* Jan. 22, 2020 Trial Tr. at 345:13–347:19. The evidence would further show (the defense said) that these purchase orders didn't explicitly preclude Tropical from reselling the products in the United States, *id.* at 349:18–24; that Tropical initially sent the shipments to Suriname, *id.* at 347:22–24; and that Tropical only later began diverting the products to the United States, *id.* at 352:4–19. The Defendants characterized these diversions as "efficient breaches" of their contracts, which earned profits for everyone—including the manufacturers and suppliers. *Id.*

The Government's star witness was Torres—the insider-cum-cooperator who outlined the conspiracy's intricate details. He testified that he had owned an "international freight forwarding" business and that he had first met the Defendants in 2007—at his warehouse in South Florida. *See*

---

[4] Although each Defendant was represented by separate counsel, we refer generally to "the Defendants" or "the defense" for ease of reference.

Jan. 28, 2020 Trial Tr. at 1679:11–23, 1682:5–1683:7. He told of how the conspirators would swap out the cargo containers' baby formula with sheetrock[5] and of how they would replace the etched cargo seals (installed by the victim companies to prevent tampering) by using a special machine that could carve identical markings—all in a concerted effort to avoid detection by customs officials and the victim companies. *See id.* at 1714:5–1717:21; Jan. 29, 2020 Trial Tr. at 1809:10–20, 1830:6–1831:7. Although much of his testimony involved activities and communications from 2015 on, Torres testified that the Defendants had defrauded about sixty companies in all, *see* Jan. 28, 2020 Trial Tr. at 1684:21–24, and that they had first begun "smuggling" and tampering with cargo weights as early as 2007, *see* Jan. 29, 2020 Trial Tr. at 1816:24–1817:4.

Other witnesses testified, including employees of the victim companies. One such witness was Gregory Bray, the finance director at Mead Johnson, a company that for years had sold baby formula to Tropical. *See* Jan. 23, 2020 Trial Tr. at 708:22–709:5. Bray is the subject of the Defendants' *Giglio* claim, so we'll excerpt the relevant portions of his testimony in some detail here.

On direct examination, Bray testified that Mead Johnson gave Tropical a 50–60% discount on baby formula because, as he understood it, "Tropical had won a government contract with the country of Suriname to provide formula at a lower price, and we sold to them to fulfill that contract." *Id.* at 731:3–5. When the Government asked Bray how he knew about Tropical's contract with Suriname, the Defendants raised a hearsay objection. *Id.* at 731:9–11. The Court intervened to ask Bray who gave

---

[5] In fact, Torres said that, to make the "dummy" shipments look real, the Defendants would fill the containers with an amount of sheetrock that matched precisely the weight of the product they were supposed to be exporting. They'd also line the front of the container—the part closest to the door—with a few rows of the real product, so that any inspector intrepid enough to open the door would see the real stuff and feel thus satisfied that the container was, as it should have been, loaded with the victim's product (rather than with sheetrock). *See* Jan. 29 Trial Tr. at 1807:8–10 ("Q. What's behind the baby formula that I just marked [*i.e.*, in a photograph exhibit]? A. It would -- either another pallet of baby formula or just empty space on top, but sheetrock on the floor."); *id.* at 1809:10–18 (explaining that the conspirators lined cases of baby formula in front of the sheetrock so that "Customs would see that there's some [baby formula] inside the container").

9

him that piece of information; when he answered that he "received that information from our finance department in the Caribbean market," the Court sustained the objection. *Id.* at 731:15–18.

After some back-and-forth about Mead Johnson's contracts and export pricing, *id.* at 731:20–736:21, the Government again asked Bray how he came to know about Tropical's contract with Suriname, *id.* at 736:10–13. This time, the Government introduced "a purchase order from [the] Suriname Tender Office to Tropical Marketing." *Id.* at 737:1–2; *id.* at 736:18 (moving this purchase order into evidence). Bray admitted that he didn't know "directly" what the Suriname Tender Office was. *Id.* at 737:8. But, when asked if he believed "that the Suriname Tender Office is part of the government of Suriname," he answered: "Yes, I do." *Id.* at 737:18–20. The Government then asked him why he thought so, and Bray—referring to the purchase order—said: "Looking at the invoice with telephone numbers, web address, . . . and the Medical Procurement Office would lead me to believe that." *Id.* at 738:2–4. When the Government asked: "Did that help inform your view that this was a government agency," Bray replied: "Yes." *Id.* at 738:10–12; *see also id.* at 741:2–5 (Bray testifying that the "Suriname" stamp on the exhibit "inform[ed]" his opinion about whether the purchase order was a *bona fide* government document).

The Government then asked about whether Mead Johnson had maintained that purchase order in its files, and the following exchange ensued:

> Q. Okay. So, while we're on Government's Exhibit 22A [*i.e.*, the purchase order], this is a document that Mead Johnson maintains, right?
> A. Yes.
> Q. Why would Mead Johnson keep a copy of a purchase order from the Suriname Tender Office's Medical Procurement Office?
> A. If it was received, we would keep it as supporting document, documenting the process of the export order.
> Q. So, Mead Johnson kept supporting documents for each and every export?
> A. Yes.

*Id.* at 738:19–739:3; *see also id.* at 786:20–23 ("Q. And, again, why did Mead Johnson keep a copy of the Suriname Tender Office Medical Procurement Office purchase order? A. If it's provided to us, it would be supporting documentation for the purchase and within our record retentions.").

On cross-examination, the defense asked Bray whether it was reasonable for him to believe that the Suriname Tender Office was a government-sponsored entity. *See* Jan. 24, 2020 Trial Tr. at 1013:17–1016:9 ("Q. You would agree with me that a name alone doesn't necessarily mean that something is associated with the government, right?"). Then, in the midst of a line of questions about the due diligence Mead Johnson had conducted on Tropical, the defense wondered: "Q. And it's fair to say that you don't have any knowledge about any Suriname Tender Office document being submitted at the very beginning of the relationship between Tropical and Mead Johnson, right? A. That's correct. I don't know what information was provided for that due diligence." *Id.* at 1019:5–10. As Bray explained, he first pulled the Tropical documents in 2018—to assist in an ongoing FDA investigation. *See id.* at 1040:8–13 ("Q. All right. What information did you provide the government? A. Invoicing, pricing information, the contracts, 2015 and '17, order information -- . . . that type of information."); *see also id.* at 1041:7–10 ("Q. . . . Okay. Including that STO, Suriname Tender Office purchase orders. A. If that was included, yes."). When asked whether the documents he pulled from the Mead Johnson files in 2018 "were there in 2016," he said he "[didn't] know when they were entered into the system." *Id.* at 1042:14–16. He also provided additional data to the government, through outside counsel, in March of 2019. *See id.* at 1051:6–8 ("Q. March 2019, I'm not sure who -- did you gather any more information as a result of that conversation? A. Yes."); *see also id.* at 1054:4–7 ("Q. . . . So, what additional documents did you go and gather after the March 2019 phone call? A. The original was for two years. I pulled all the years from 2013 through 2018.").

A second defense lawyer asked Bray whether Mead Johnson had relied on the fake purchase order in deciding to do business with Tropical. Again, however, Bray said that he didn't know. *See id.*

at 1166:13–17 ("Q. . . . [I]n 2007, was Mead Johnson reviewing Suriname Tender Office purchase orders as part of its mechanism to validate the volumes that were being sent down to Suriname? A. I do not know, sir."). Bray also testified that he didn't know whether the purchase order would have been part of Mead Johnson's 2017 review of Tropical—since the document would have been sent to a separate department. *See id.* at 1167:2–10 ("Q. . . . How about in 2017, were these documents included? A. Again, as part of my role, I would not know. Those were colluded -- or included with any information that would have been sent to the Caribbean region. Q. Okay. When were these documents, and documents like this from the Suriname Tender Office, these purchase orders, first included in materials that were given to the local market of Mead Johnson, the CARICOM office? A. I do not have that information.").

Other witnesses testified about the Suriname Tender Office. For example, Candace Kahn-Hosein, who worked in Mead Johnson's Caribbean office, testified that Doekhie and Nabi "told [her] about the Suriname Tender Office," which she believed was a governmental entity. *See* Jan. 28, 2020 Trial Tr. at 1449:19–1450:3. Jose Burneo, a general manager for a second victim company (Alcon), testified that Doekhie and Nabi had told him that they "had an opportunity for a tender from the government [of Suriname]." Jan. 22, 2020 Trial Tr. at 525:19–23. In fact, the Government introduced, without objection, a letter the Defendants sent to Alcon, in which they had "confirm[ed] that Tropical's main customer base consists of: Government of Suriname (Tender Office)" and other entities. *Id.* at 541:17–25. Burneo testified that he believed the Suriname Tender Office was part of the Surinamese government. *Id.* at 542:17–21.

After the Government rested, the Defendants moved under Rule 29 for a judgment of acquittal, arguing that the evidence established a breach of contract—nothing more. *See* Feb. 3, 2020 Trial Tr. at 2710:23–25, 2711:22–2712:2. In saying so, the defense (again) referred to the Superseding Indictment's contention that the Defendants, "from the outset," intended to (and did) sell the victim

companies' products in the United States. *Id.* at 2715:16–23. The problem with that charge (in the Defendants' view) was that the Superseding Indictment pegged the conspiracy as starting in 2013, even though the Defendants had indisputably entered into commercial relationships with the victim companies as early as 2008. *Id.* And (so the argument went), since the Government hadn't shown that the Defendants had reimported goods *before* 2013, it had failed to prove that the fraud began from "the outset." *Id.*

We disagreed. As we saw the case, there was "a lot of evidence that there were intentionally fraudulent misrepresentations made by the defendants *during the course of the relationship*," which (again) distinguished this case from *O'Donnell.* Feb. 4, 2020 Trial Tr. at 2791:12–2792:12 (emphasis added). And *O'Donnell* (like many other cases) had held that fraudulent representations "during the course of the relationship" *could* serve as circumstantial evidence of an intent to defraud. *Id.* In any event, as we noted, Torres *had* testified that the scheme dated as far back as 2007—that is, "from the outset" of the Defendants' relationships with the victim companies. *See id.* at 2792:13–2793:11; *see also id.* at 2810:18–20 ("Mr. Torres has testified, as you have suggested, true or not, that the scheme to defraud, the deception, the diversion began in 2007."). Accordingly, we denied the Rule 29 motion. *Id.* at 2810:21–22.

On February 6, 2020, the jury returned unanimous guilty verdicts as to all three Defendants on all counts of the Superseding Indictment. *See* Jury Verdict as to Sherida Nabi [ECF No. 347]; Jury Verdict as to Johnny Grobman [ECF No. 344]; Jury Verdict as to Raoul Doekhie [ECF No. 343].

13

## V.   MOTION FOR NEW TRIAL

Two weeks later, Grobman filed a Motion for a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure (the "Motion") [ECF No. 366],[6] claiming that (1) the evidence at trial (and the Court's jury instructions) constructively amended, and materially varied from, the Superseding Indictment, and (2) the Government committed a *Giglio* violation by procuring false testimony from Mr. Bray. That Motion—which is now ripe for adjudication[7]—is the subject of this Order.

### THE NEW TRIAL STANDARD

Under Rule 33 of the Federal Rules of Criminal Procedure, which governs motions for new trial, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The Rule identifies two types of motions for a new trial: those based on newly discovered evidence and those based on "other grounds," such as errors at trial. *Id.* at (b)(2). "Where a motion for new trial argues that the court committed errors during the trial, the convicted defendant has the burden of showing that (1) some error was in fact committed and (2) that such error was prejudicial to him. Even if the defendant has made such a showing, a new trial is not warranted unless the error affected the defendant's substantial rights." *United States v. Findley*, 2018 WL 9662771, at *2 (S.D. Fla. Sept. 20, 2018), *aff'd*, 806 F. App'x 966 (11th Cir. 2020) (cleaned up). The decision to grant or deny a motion for new trial rests in the district court's sound discretion. *See United States v. Fernandez*, 136 F.3d 1434, 1438 (11th Cir. 1998).

---

[6] Nabi and Doekhie adopted (and joined in) the Motion. *See* Defendants Sherida Nabi's and Raoul Doekhie's Motion to Adopt/Join Co-Defendant Johnny Grobman's Motion for New Trial [ECF No. 368].

[7] *See* Response in Opposition to Defendant Johnny Grobman's Motion for a New Trial ("Response") [ECF No. 371]; Defendant Johnny Grobman's Reply to Response to Motion for a New Trial Pursuant to Rule 33 ("Reply") [ECF No. 375].

**CONSTRUCTIVE AMENDMENT & MATERIAL VARIANCE**

**I.      THE LAW**

The Fifth Amendment to the Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. A criminal defendant cannot, consistent with that Amendment, be "tried on charges that are not made in the indictment against him," and he may not be convicted on theories that the indictment "cannot fairly be read as charging." *Stirone v. United States*, 361 U.S. 212, 217 (1960). When the evidence at trial or the court's jury instructions deviate from what's alleged in the indictment, "either a constructive amendment or a variance can arise." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015).

A "constructive amendment" of an indictment "occurs when the essential elements of the offense contained in the indictment are altered"—either by the prosecutor's actions or the district court's instructions—"to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013) (cleaned up). "An error of this magnitude is *per se* reversible because it violates the defendant's constitutional right to be tried solely on the charges returned by the grand jury." *United States v. Johnson*, 713 F.2d 633, 643 (11th Cir. 1983). But evidence intrinsic to the charged offenses does not impermissibly broaden the indictment to include other crimes; rather, the "critical inquiry is whether appellants have been 'convicted of an offense not charged in the indictment.'" *United States v. Lehder–Rivas*, 955 F.2d 1510, 1519 n.5 (11th Cir. 1992) (quoting *United States v. Artrip*, 942 F.2d 1568, 1570 (11th Cir. 1991)).

A variance occurs, by contrast, "when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *Holt*, 777 F.3d at 1261 (cleaned up). "The allegations in the indictment and proof at trial must correspond so that the defendant is properly notified of the charges, enabling him to present a defense, and is protected

against a subsequent prosecution for the same offense." *Id.* (citing *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989)). "Unlike a constructive amendment, a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced." *Id.*

## II.   ANALYSIS

The Defendants contend that the Superseding Indictment charged them with "fraud in the inducement"—and that, as a result, the Government should have directed its evidence *only* to this theory of liability. *See* Motion at 3–4. Since the Government's proof was not so circumscribed—indeed, because it introduced evidence of "garden-variety fraud during the course of ongoing contractual relationships"—the Defendants insist that the evidence at trial deviated impermissibly from the allegations in the Superseding Indictment. *Id.* The Defendants also suggest that the Court erred by approving a set of instructions that permitted the jury to convict them of *either* fraud in the inducement *or* post-contract fraud. *See id.* These (purported) errors, they say, worked a constructive amendment of the Superseding Indictment (or, at least, a material variance from it) and warrant a new trial. *Id.*

Like the man who shoots his arrow and, once it's landed, paints a target around it, our Defendants have conjured an indictment that never was and, having concluded that the Government's proof failed to conform to that imaginary document, now move for a new trial. As we've explained, the Superseding Indictment *never* used the phrase "fraud in the inducement," and no aspect of its sweeping allegations can be plausibly construed as having restricted its ambit to that single cause of action. *See generally* Superseding Indictment. To the contrary, the Superseding Indictment *explicitly* charged the Defendants with engaging in a complex web of *post-contract* concealment, falsification, and misdirection. *See, e.g.*, *id.* at 7 (describing how the Defendants U-turned shipments, exported dummy shipments, submitted fraudulent documents to U.S. Customs agents, and presented fake export papers to the victim companies). And we really needn't do more to persuade the Defendants of this because,

16

before trial, they *themselves* conceded as much. *See* Motion to Dismiss at 7 (faulting the Superseding Indictment for alleging only "post-contractual events occurring between March 2013-December 2018"). In any event, this congruity between the facts alleged and the evidence at trial is enough to defeat their variance arguments here. *See, e.g.*, *United States v. Ervin*, 601 F. App'x 793, 796 (11th Cir. 2015) (explaining that there is no variance when the "facts proved at trial do not deviate from the facts alleged in the indictment" (cleaned up)).

Ignoring these inconvenient allegations, the Defendants argue that a single phrase—repeated twice in the Superseding Indictment—delimited the *type* of wire fraud the Government was permitted to prove. *See* Motion at 7 n.2 ("Having chosen its charges, the Government turned the case into a situation akin to [*O'Donnell*]" and "constrained itself to demonstrating fraud by fraud in the inducement"). But, again, the Defendants misconstrue the plain language of the charges. The Superseding Indictment averred that the Defendants, "from the outset, intended to, and did, sell those goods, drugs, and medical products at a substantial profit to wholesalers, distributors, and others in the United States." Superseding Indictment at 6, 9. That phrase, "from the outset," did not mean to suggest (as the Defendants now insist) that the crime took place at a fixed moment in time— punctuated by a single act of "pre-contract inducement" that demarcated both the conspiracy's beginning and its end. Just the opposite: The phrase "from the outset" unambiguously planted a flag on the spot where the fraud *began* and indicated that the Defendants perpetrated their scheme *from* that spot, for several years, all the way up to (and including) the conspiracy's conclusion. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2007) (defining "from" as "[i]ndicating a starting-point in time, or the beginning of a period"). This, in fact, is what the preposition "from" has meant throughout the six-hundred-year history of modern English. *See, e.g.*, 2 *Timothy* 3:15 (King James) ("From a childe thou hast known the holy Scriptures . . . ."); WILLIAM SHAKESPEARE, HENRY V act 4, sc. 3, l. 58–62 ("This story shall the good man teach his son, And Crispin Crispian shall ne'er go by, From this day to the

ending of the world, But we in it shall be remembered—We few, we happy few, we band of brothers.").

Read this way, the phrase is unsurprisingly consistent with the rest of the Superseding Indictment—which, again, describes a *series* of fraudulent activities over time. *See* Superseding Indictment at 5 ("From at least as early as in or around March 2013, the exact date being unknown to the Grand Jury, through in or around December 2018 . . . the defendants . . . did knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud . . . ."). And it's consistent, too, with the wire fraud statute generally, which requires knowing participation in a "scheme to defraud." *United States v. Estepa*, 998 F.3d 898, 908–09 (11th Cir. 2021) (the elements of wire fraud are "(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate . . . wires in furtherance of that scheme"); *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (defining a scheme to defraud as "any plan or *course of action* by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises" (emphasis added)); Eleventh Circuit Pattern Crim. Jury Instr., O51 (Wire Fraud) (2020) (defining a "scheme to defraud" as "any plan or *course of action* intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations, or promises" (emphasis added)).

We needn't go further, but we will—because the sin of which the Defendants have accused the Government is not so great an evil as they have imagined it to be. The Government, after all, was free to introduce *even* uncharged acts at trial, so long as those acts were part of the alleged scheme. *See United States v. Bajoghli*, 785 F.3d 957, 962–63 (4th Cir. 2015) ("[W]hen the government charges a defendant under § 1347 with a scheme to defraud and elects to charge only some of the executions of that scheme, its election does not limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme."); *United States v. Pless*, 79 F.3d 1217, 1220

(D.C. Cir. 1996) ("The jury could logically conclude that the scheme was in part executed by the three deposits. And it is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme."). There was, in short, no "variance" between the allegations of the Superseding Indictment and the proof at trial. The Defendants were "properly notified of the charges, enabling [them] to present a defense," and there was no risk of "a subsequent prosecution for the same offense." *Holt*, 777 F.3d at 1261 (cleaned up).[8]

---

[8]     The Defendants also try to make hay out of an exchange at trial in which the Court acknowledged that the Government had charged a conspiracy from 2013 to 2018, even though the evidence showed commercial relationships between Tropical and some of the victim companies dating back to 2007 or 2008. *See* Motion at 5 (suggesting that the Government had "artificially" limited the conspiracy from 2013 to 2018 in the Superseding Indictment); *see also* Feb. 3, 2020 Trial Tr. at 2737:17–23 (noting that, whatever the "outset" meant—*i.e.*, either the start of the Defendants' relationship with one another or the beginning of Tropical's relationships with the victim companies—the "outset" appeared to reach back as early as 2007 or 2008).

As we explained during the trial, though, Torres testified that the scheme dated back to 2007, shortly after he first met the Defendants. *See* Feb. 4, 2020 Trial Tr. at 2792:17–18 (the Court explaining that "Torres said that the fraud began from the beginning or within six months of him meeting Grobman and Doekhie in 2007"). The Defendants (it's true) may quibble with Torres's credibility, but that's really a question for the jury—not the Court—to decide. And we can safely assume that the jury, having found the Defendants guilty, believed Torres's version of the events. *See United States v. Slade*, 681 F. App'x 870, 872 (11th Cir. 2017) ("Since credibility questions are the province of the jury, and since the jury found [the defendant] guilty, we can assume that the jury considered [the police officers who testified against him] to be credible witnesses."). In any case, the Defendants' intentional misrepresentations between 2013 and 2018 constituted sufficient circumstantial evidence of their criminal intent "from the outset" of their relationships—*whenever* those relationships began. *See id.* at 2791:1–17 ("[I]rrespective of what was said at the beginning of the relationship . . . the government has—whether it's beyond a reasonable doubt, I have no idea—a lot of evidence that there were intentionally fraudulent misrepresentations made by the defendants during the course of the relationship," which was "sufficient to prove fraud under the statutes").

We note, too, that these comments from the Court—the ones the Defendants rely on and which we've excerpted here—arose in an entirely different context. At the Rule 29 phase, the Court pointed out that the Government had introduced evidence of the Defendants' criminal conduct dating back to 2007—even though the Superseding Indictment charged that the conspiracy had begun in 2013. Whatever the technical merits of this position, though, the Defendants are *not* here arguing that the Government improperly introduced evidence of criminal conduct stretching back to 2007— presumably because any such argument would be in tension with their basic theory of the case, which is that the Government *has no evidence* of criminal intent "from the outset" of the contractual relationships.

Against all this, the Defendants fall back on *O'Donnell*. But, despite having relied on that decision at nearly every phase of this litigation, they appear to misunderstand its central teachings. In *O'Donnell*, the government (as *qui tam* intervenor) sued a bank under a statute that incorporates federal wire fraud as a predicate act. *See O'Donnell*, 822 F.3d at 653–55. The lawsuit centered around the bank's relationship with Fannie Mae and Freddie Mac. In the contracts it signed with those entities, the bank had promised to sell them only "investment quality" mortgages. *Id.* Despite those promises, the government alleged, the bank had sold Fannie and Freddie a large portfolio of subpar mortgages—a series of contractual breaches the government charged as a scheme to defraud. *Id.*

On appeal, the bank challenged the sufficiency of the government's evidence on the element of criminal intent. *Id.* at 658.[9] On this point, the bank noted that "the common law does not permit a fraud claim based solely on contractual breach." *Id.* In the bank's view, then, the promises it had made in the purchase agreements were, *standing alone*, insufficient to prove criminal intent. *See id.* at 653, 658. The Second Circuit agreed, finding that "[t]he Government did not prove—in fact, did not attempt to prove—that at the time the contracts were executed [the bank] never intended to perform its promise of investment quality." *Id.* at 663. Without contemporaneous fraudulent intent, in sum, there was no crime—just a breach of contract. *Id.*

But *O'Donnell* did not hold—as the Defendants here maintain—that the prosecution in a wire fraud case is constrained to offering evidence of contemporaneous *activities* simply because it is required to prove contemporaneous *intent*. To the contrary, the Second Circuit cited with approval cases in which the defendants were found guilty of "deceptive conduct . . . employed in a contractual relationship to hide breaches of contract or nonperformance," noting that "the law of these cases is perfectly consistent with our holding today that fraudulent intent must be found at the time of the

---

[9] The bank thus never argued—as the Defendants do here—that the government's proof had varied from the charges in the civil complaint.

allegedly fraudulent conduct[.]" *Id.* at 661 n.12. The court also pointed out that the government *could have*, but didn't, introduce subsequent acts of concealment or misdirection as circumstantial evidence of fraudulent intent. *See id.* at 663 ("Nor did [the government] prove that [the bank] made any *later* misrepresentations—*i.e.*, ones not contained in the contracts—as to which fraudulent intent could be found." (emphasis added)). And this makes sense. After all, it's well-settled that a defendant's *subsequent* conduct can be used to prove his preexisting criminal intent. *See United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018) (holding that "a jury may infer the 'intent to defraud' from the defendant's conduct and circumstantial evidence"); *United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985) ("A subsequent act, as well as a prior act, can be used to show intent under Rule 404(b)."). Nothing in *O'Donnell* altered this basic principle.

Indeed, *O'Donnell* rather squarely supports the verdict in our case. The post-contract conduct the Government introduced against the Defendants—concealment, misdirection, and deception— was precisely the kind of evidence that (the Second Circuit suggested) would have sufficed to establish the bank's criminal intent in *O'Donnell*. *See* (again) *O'Donnell*, 822 F.3d at 663. And the Defendants point to no federal decision that purports to preclude the government from introducing post-contract fraudulent conduct as probative evidence of the defendant's contemporaneous criminal intent.

The Defendants' variance argument fails for yet another reason. Whereas a constructive amendment is prejudicial *per se*, a material variance requires reversal "only when the defendant can establish that his rights were substantially prejudiced." *Holt*, 777 F.3d at 1261. A defendant can establish prejudice when he shows that he was "unfairly surprised and was unable to prepare an adequate defense." *United States v. Lander*, 668 F.3d 1289, 1295 (11th Cir. 2012). Although the Defendants cite this rule in their brief, they make no effort to explain how or why they were prejudiced. *See generally* Motion. They've thus waived any such argument. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in

the reply brief are deemed waived."). Waiver aside, the Defendants couldn't plausibly claim prejudice. Not only did the Superseding Indictment specifically reference the (allegedly) fraudulent acts the Government later proved at trial, but the Government was pellucid in several pretrial hearings about its intent to introduce evidence of those acts at trial. *See, e.g.*, Dec. 4, 2019 Goodman Hr'g Tr. [ECF No. 246] 74:21–24 ("THE COURT: Page 6 of the superseding indictment. From the outset. So your position is we do have such evidence and we intend to introduce it at trial, correct? MR. BROWNE: Yes."). They thus cannot (and, really, do not) claim that they were surprised by this proof or that they were unable to prepare themselves against it.

Nor does our case involve any constructive amendment of the indictment.[10] Neither the evidence at trial nor the jury instructions modified the "essential elements" of the charges or "broaden[ed] the possible bases for conviction beyond what [was] contained in the indictment." *Madden*, 733 F.3d at 1318 (cleaned up). The Superseding Indictment alleged that the Defendants participated in an *ongoing* scheme to defraud the victim companies. The Government established the existence of that scheme *both* through the testimony of Mr. Torres *and* by introducing evidence of the Defendants' concerted efforts at concealment and misdirection—activities specifically referenced in the Superseding Indictment. The jury evidently believed Mr. Torres—which, of course, was its prerogative. But, even if it hadn't, the jury was entitled to use the Defendants' post-contract behavior—those very acts of concealment and misdirection—to infer the Defendants' contemporaneous criminal intent. The Defendants were therefore not "convicted of an offense not charged in the indictment." *Lehder–Rivas*, 955 F.2d at 1519 n.5 (cleaned up).[11]

---

[10] The Defendants never actually advance a constructive-amendment argument—other than to lump that claim together with their variance contentions. *See* Motion at 3 (arguing that "[a] variance and constructive amendment occurred at trial," without differentiating the two).

[11] Again, to the extent the Defendants complain that they were charged with "inducement" fraud but convicted of "post-contract fraud," they haven't identified a case—including *O'Donnell*—that recognizes any such distinction.

Finally, we address an argument the Defendants raise only obliquely—that it was improper for the Government to introduce Exhibits 1A and 1AA, because those exhibits contained evidence of their distribution of products the FDA *doesn't* regulate. *See* Motion at 6 (pointing out that "the Government introduced, over objection, Exhibits 1A and 1AA with schedules of different manufacturers of office supplies, binders and notebooks and even car fresheners none of which are FDA-regulated products . . . and presented them to the jury as victim manufacturers having been defrauded"); *see also id.* at 3 ("What was presented at trial was garden-variety fraud during the course of ongoing contractual relationships relating to many products, including non-FDA regulated products."). The Defendants don't explain how this evidence contributed to the purported variance, *see generally id.*—mainly because they limit their variance arguments to the *timing* of the alleged criminal acts, not the *kinds* of products they involved, *see id.* at 6–7 ("The Superseding Indictment restricted the charge temporally to misrepresentation from the outset. Yet at trial the government did not introduce misrepresentations from the outset and was allowed to enter into evidence representations made over 7, 8 and 10 years after the outset of the relationship made to many companies.").

In any event, as we explained at trial, these two exhibits were admissible to show "how the process would work for [Grobman] to receive the bills—the company's information and the tracking information for the product in containers from which he would then create false bills of lading to continue to deceive the companies. It was an integral part of his story." Feb. 5, 2020 Trial Tr. at 3180:8–13 (denying Defendant Johnny Grobman's Motion for Mistrial [ECF No. 329]). Because the evidence thus helped to outline the manner and means by which the scheme was effectuated, it didn't vary from the Superseding Indictment. *See Lehder–Rivas*, 955 F.2d at 1519 n.5 (evidence properly admitted as "intrinsic" to the charged offense "does not impermissibly broaden the indictment to include other crimes"). Indeed, one would scour the Defendants' papers in vain for any explanation as to how this evidence was *extrinsic* to the charged scheme. *See generally* Motion; *see also* Reply at 2

("[T]he Government states that the majority but not all of the products offered into evidence were FDA-regulated. That is precisely what a variance is. The Superseding Indictment is rife with allegations that the Government was charging a conspiracy to commit fraud in the inducement to purchase food and theft of pre-retail medical products."). They also fail to argue that they were substantially prejudiced by this evidence—an omission that, again, is fatal to their variance contentions. *See, e.g.*, *Holt*, 777 F.3d at 1261 ("Unlike a constructive amendment, a variance requires reversal only when the defendant can establish that his rights were substantially prejudiced."); *see also United States v. Baldwin*, 774 F.3d 711, 725 (11th Cir. 2014) ("Because [the defendant] does not allege any prejudice arising from this variance, reversal [of his conviction] is not warranted.").

## GIGLIO

### I.   THE LAW

A *Giglio* violation[12] is a "species" of *Brady* violation. *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276 (11th Cir. 2005). To justify a new trial based on a *Giglio* violation, the defendant must show that "(1) the prosecution knowingly used perjured testimony, or failed to correct false testimony upon learning of its falsity; and (2) the use of such testimony was material, meaning that it is reasonably likely that the false testimony could have affected the judgment." *United States v. Gallardo*, 977 F.3d 1126, 1142 (11th Cir. 2020). But "the defendant generally must identify evidence the government withheld that would have revealed the falsity of the testimony. In other words, there is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (cleaned up).

There can be no *Giglio* violation when the witness's prior statement is "merely inconsistent" with his trial testimony. *See id.* at 1149 (quoting *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010)). Nor is there a *Giglio* violation when the witness's testimony was false due to mistake, confusion,

---

[12] *Giglio v. United States*, 405 U.S. 150 (1972).

or faulty memory. *See United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017) (to qualify as prosecutorial misconduct under *Giglio*, "testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory" (cleaned up)); *see also United States v. Bailey*, 123 F.3d 1381, 1395–96 (11th Cir. 1997) (holding that a mere "memory lapse, unintentional error, or oversight" cannot form the basis of a viable *Giglio* claim).

## II. ANALYSIS

The Defendants argue that the Government solicited false testimony from Gregory Bray about certain purchase orders from the Suriname Tender Office. *See* Motion at 10. As they see it, Bray led the jury to believe that Mead Johnson kept copies of those purchase orders throughout its commercial relationship with Tropical, and that Bray himself had relied on those documents in concluding that Tropical maintained a legitimate contract (or tender) with the government of Suriname. *See id.* That testimony, the Defendants say, allowed the jury to infer that Tropical initially "lured" Mead Johnson with the fake purchase orders, at the beginning of their relationship—even though, in truth, Tropical didn't fabricate those purchase orders until December of 2018 and didn't send them to Mead Johnson until January of 2019. *See id.* at 10–11. The Defendants' *Giglio* claim fails for four reasons.

*First*, the Defendants mischaracterize Bray's testimony. As we've explained, he didn't testify that Mead Johnson maintained the fake purchase orders in its files since the beginning of its relationship with Tropical. The Defendants, in fact, had to cut and paste together distinct portions of Bray's testimony to create the impression that he did. Specifically, they amalgamated parts of the transcript (1) in which Bray testified that Mead Johnson gave Tropical a discount because of its contracts with Suriname, (2) in which the Government showed Bray a copy of a fake purchase order and asked him whether he believed the Suriname Tender Office was real, and (3) in which Bray testified that Mead Johnson would have maintained the purchase order in the ordinary course of its business. *See* Motion at 9–10 (excerpting several unrelated portions of Bray's trial testimony). But none

of these propositions is inconsistent with the Defendants' assertion that Mead Johnson couldn't have

seen the purchase order until January of 2019 because they didn't fabricate it until December of 2018.

For one, Bray never said—as the Defendants claim—that "he relied on [the Suriname Tender

Office purchase orders] to form his conclusion Mead Johnson had a government contract." *Id.* at 10.

Recall that, when the Government asked Bray *how* he knew about Tropical's contract with Suriname,

the Defendants interposed a hearsay objection. *See* Jan. 23, 2020 Trial Tr. at 731:9–11. The Court

sustained that objection after Bray answered that he had "received that information from our finance

department in the Caribbean market." *Id.* at 731:15–18. The Government did not follow up to ask if

Bray had personally seen any documents regarding Tropical's contract with the government of

Suriname, and it never again asked him how or when he formed his opinion. *See generally id.* Nor did

Bray ever suggest that he had seen this document years earlier. In fact, in explaining Bray's belief that

the Suriname Tender Office was a governmental entity, the Government walked him through certain

governmental indicia on the document itself—unmistakably indicating that Bray was basing his

opinion about the provenance of that purchase order on the markings he observed *as he sat in the witness

box*. The relevant portions of that exchange went like this:

> Q. Do you know what that document is?
> A. It's a purchase order from Suriname Tender Office to Tropical Marketing.
> Q. And what is the Suriname Tender Office?
> MR. WAX: Objection. Outside the scope of the witness's knowledge.
> THE COURT: If he knows.
> MR. WAX: And no predicate.
> A. I do not know directly.
> Q. Okay.
> THE COURT: Sustain.
> BY MR. BROWNE: Q. Do you believe that the Suriname Tender Office is part of the
> government of Suriname?
> MR. WAX: Objection. Speculative and assumes facts not in evidence.
> THE COURT: If he knows.
> BY MR. BROWNE: Q. Do you believe that the Suriname Tender Office is part of the
> government of Suriname?
> A. Yes, I do.
> Q. Okay. Does this purchase order that you have in front of you have --
> THE COURT: How does he know that?

> BY MR. BROWNE: Q. How do you know -- or why do you believe that the Suriname
> Tender Office was part of the government of Suriname?
> A. Looking at the invoice with telephone numbers, web address, uhm, and the Medical
> Procurement Office would lead me to believe that.
> Q. Okay. How about this here in the upper left-hand corner and this in the upper
> right-hand corner?
> MR. WAX: Objection to the leading.
> THE COURT: Overruled.
> BY MR. BROWNE: Q. Did that help inform your view that this was a government
> agency?
> A. Yes.

*Id.* at 737:25–738:12. And, if we're being candid, we needn't speculate about whether Bray first formed

his opinion about the STO's connection to the government of Suriname from this purchase order

because, before the Court sustained the defense's objection, he specifically attested that he'd learned

about the connection—not from the document—but from speaking with other members of his team.

*Id.* at 731:15–18.

More importantly, Bray did not lead the jury "to believe the [the Suriname Tender Office

purchase orders] existed in Mead Johnson files for all Tropical orders during the entire ten (10) year

relationship, or at a minimum, at least 2015-2018." Motion at 10. When the Government asked him

whether Mead Johnson had retained that document, Bray spoke only generally about the company's

business practices—and never attested that Mead Johnson had received that precise document at any

specific point in time. *See* Jan. 23, 2020 Trial Tr. at 738:19–739:3 ("Q. Why would Mead Johnson keep

*a copy* of a purchase order from the Suriname Tender Office's Medical Procurement Office? A. *If* it

was received, we *would* keep it as supporting document, documenting the process of the export order."

(emphases added)); *see also id.* at 786:20–23 ("Q. And, again, why did Mead Johnson keep *a copy* of the

Suriname Tender Office Medical Procurement Office purchase order? A. *If* it's provided to us, it *would*

be supporting documentation for the purchase and within our record retentions." (emphases added)).

The Defendants, in short, have failed to show that Bray's testimony was false.

*Second*, to prove that Bray's testimony was false—and that the Government should have known it was false—the Defendants point to three pieces of evidence: (1) an email from Ari Silva (an employee at Mead Johnson), asking his subordinates for "evidence[ ] of Suriname sales to Government," Motion at 14–15 (citing Def.'s Ex. 251 [ECF No. 357-11]); (2) Suriname Tender Office purchase order #3791, which Silva's subordinate sent him in response to that email, *id.*; and (3) Special Agent Justin Fielder's report of his interview with Bray, in which Agent Fielder concluded that "Bray did not know if the contract with Tropical involved a government entity," *id.* at 15. But, putting aside whether any of this evidence establishes the falsity of Bray's testimony, the Defendants don't deny that they had all this evidence *before* trial. *See* Response at 5 (contending that the three documents were disclosed during discovery); *see generally* Reply (not disputing that these documents were provided in discovery). That fact alone, of course, defeats their *Giglio* claim. *See Stein*, 846 F.3d at 1147 (explaining that, because a *Giglio* violation is a species of *Brady* claim, the defendant must "identify evidence the government *withheld* that would have revealed the falsity of the testimony" (emphasis added)).[13]

---

[13]     It's worth adding that the three documents don't actually prove that Bray was lying. The documents, after all, have little to say about *when* the Defendants first fabricated the purchase order (whether in late 2018 or earlier) or *when* Mead Johnson received it.

   The Defendants disagree. In their view, if Mead Johnson *really* had the Suriname purchase orders all along, "Silva[ ] would not have asked [his subordinate] for 'evidence of sales to the Government'" and could have "simply access[ed] the electronic system . . . where the [Suriname Tender Officer purchase orders] were scanned into the system [according to Bray]." Motion at 15. That, though, is mere speculation about what Silva (who wasn't called to testify) would have done and whether he knew where in the system to find old files.

   The Defendants also suggest that some minor differences in two versions of the same purchase order "should have alerted the Government" that the purchase order was not maintained in Mead Johnson's records. *Id.* (comparing Government Exhibit 1 MJN 92 *with* Government Exhibit 22A). We disagree. It's common practice in business—as in the law—for documents to change materially over time, as new edits are incorporated into subsequent drafts. The point here, though, is that these minor differences between the two versions of the purchase order tell us nothing about *when* Mead Johnson first received it.

   Finally, the Defendants contend that Agent Fielder's report contradicted Bray's testimony that "he relied on the [Suriname Tender Office purchase orders] to reach his conclusion [that] Tropical had a government contract and the STO was a governmental agency." *Id.* But that's only true if we accept the Defendants' central assumption—that Bray formed his opinion about the supposed

28

Recognizing as much, the Defendants say that "[t]he undisclosed evidence is not the documents themselves *but the fact [that the purchase orders] did not exist [in 2017]* and that [Mead Johnson] did not keep a [Suriname Tender Office purchase order] for each and every export. The undisclosed evidence is [that] [Mead Johnson] received these [Suriname Tender Office purchase orders] in January 2019." Reply at 6 (emphasis added). And it's here—at its core—that the *Giglio* claim falls apart. In a nutshell, the Defendants' argument is this: The Government should have told us that a purchase order *we fabricated* in 2018 didn't exist in 2017 and that *we didn't send it* to Mead Johnson until after we had fabricated it. But, of course, the Defendants know when they created that document and when they transmitted it to Mead Johnson. And *Giglio* doesn't require the Government to tell the Defendants things they already know.

*Third*, the Defendants did, in fact, cross-examine Bray about his knowledge of Tropical's supposed contract with Suriname and whether he'd seen the Suriname Tender Office purchase orders. Consistent with his testimony on direct, Bray explained that (1) he first pulled Tropical documents at some point in 2018, but *didn't know* whether that initial batch included the Suriname Tender Office

_____

connection between the Suriname Tender Office and the Surinamese government by looking at a copy of the purchase order *years earlier*. As we've seen, however, Bray formed this opinion, not from reviewing this purchase order, but from speaking with other Mead Johnson employees. *See* Jan. 23, 2020 Trial Tr. at 731:9–18.

At best, then, we're left with three relatively innocuous pieces of evidence, each of which the Defendants *could have* used to impeach Bray, but didn't—this, despite having asked Bray what he'd told Agent Fielder about Tropical's contract with a governmental entity, *see* Jan 24, 2020 Trial Tr. at 995:23–997:19 (questioning Bray about his interview with Agent Fielder). Indeed, the defense specifically asked Bray at least one question about Agent Fielder's report—though, again, without ever approaching the subject they now claim was so critical to the outcome of the case. *See id.* at 998:23–999:4 ("Q. You stated in your interview with Agent Fielder that you did not know if the contract with Tropical involved a government entity, didn't you? A. I don't remember what I said in that interview. Q. You have no recollection whatsoever. A. For that statement, no, sir."). For what it's worth, the defense also asked Bray about Silva—though Bray didn't recognize the name. *See* Jan. 27, 2020 Trial Tr. at 1172:18–20 ("Q. Who is Aristides Silva? And I might be mis – sometimes referred to as 'Ari Silva.' A. I do not recognize that name."). This just isn't nearly enough to justify a new trial. *See United States v. Rodriguez Cuya*, 769 F. App'x 868, 875 (11th Cir. 2019) (affirming denial of a new trial motion based on newly discovered evidence where the evidence was "at best . . . the basis for impeachment").

purchase order;[14] (2) he sent the government, through outside counsel, another batch of documents in March of 2019;[15] (3) he didn't know when the purchase order was first entered into the system;[16] and (4) he didn't know anything about whether Mead Johnson initially relied on the purchase order in deciding to enter into a contract with Tropical.[17] Since the Defendants thus had every opportunity to cross-examine Bray on his supposedly misleading testimony, they can show no prejudice now.

---

[14] *See* Jan. 24, 2020 Trial Tr. at 1040:8–13 ("Q. All right. What information did you provide the government? A. Invoicing, pricing information, the contracts, 2015 and '17, order information -- . . . that type of information."); *see also id.* at 1041:7–10 ("Q. . . . Okay. Including that STO, Suriname Tender Office purchase orders. A. *If that was included*, yes." (emphasis added)). In this exchange, the Court understood Bray to be saying that he didn't know whether the STO purchase order was included in the batch of documents he pulled for the FDA in 2018—though, if it had been there, he would have included it in the package he sent the government. Bray, in fact, consistently spoke in the conditional tense when he didn't quite know whether a central premise of the lawyer's question was true. *See, e.g.*, Jan. 23, 2020 Trial Tr. at 738:22–24 ("Q. Why would Mead Johnson keep a copy of a purchase order from the Suriname Tender Office's Medical Procurement Office? A. *If it was received*, we *would* keep it as supporting document, documenting the process of the export order." (emphases added)); *id.* at 786:20–23 ("Q. And, again, why did Mead Johnson keep a copy of the Suriname Tender Office Medical Procurement Office purchase order? A. *If it's provided to us*, it *would* be supporting documentation for the purchase and within our record retentions." (emphases added)).

[15] *See* Jan. 24, 2020 Trial Tr. at 1051:6–8 ("Q. March 2019, I'm not sure who -- did you gather any more information as a result of that conversation? A. Yes."); *see also id.* at 1054:4–7 ("Q. . . . So, what additional documents did you go and gather after the March 2019 phone call? A. The original was for two years. I pulled all the years from 2013 through 2018.").

[16] *See* Jan. 24, 2020 Trial. Tr. at 1041:8–1042:23 ("Q. And those documents were put together -- meaning the Suriname Tender Office, the purchase order from Tropical . . . those were all put together at the time or near the time of the dates on those documents, right? A. I pulled that -- I pull that information in 2018 . . . . Q. The ones that you pulled and reviewed, they were there in 2016. A. I don't know when they were entered into the system . . . . Q. Well, were they . . . created by Mead Johnson much later on, like in 2018, after it learned of the investigation, to bolster its claims? You're not saying that. A. As you noted, you know, we're a paperless society. I don't know when they were scanned and put into the system.").

[17] *See* Jan. 24, 2020 Trial. Tr. at 1019:5–10 ("Q. And it's fair to say that you don't have any knowledge about any Suriname Tender Office document being submitted at the very beginning of the relationship between Tropical and Mead Johnson, right? A. That's correct. I don't know what information was provided for that due diligence."); *see also* Jan. 27, 2020 Trial Tr. at 1166:13–17 ("Q. . . . How about documents, not necessarily this date, but in 2007, was Mead Johnson reviewing Suriname Tender Office purchase orders as part of its mechanism to validate the volumes that were being sent down to Suriname? A. I do not know, sir.").

*Fourth*, even if Bray had lied, and even if the Government hadn't disclosed the documents that proved he was lying, and even if the Defendants somehow didn't know that the purchase order they created didn't "exist" before they created it, and even if the Defendants hadn't had a chance to cross-examine Bray on the very issue they now claim he lied about, we'd still find it not "reasonably likely that the false testimony could have affected the judgment." *Gallardo*, 977 F.3d at 1142. The fake purchase order was but one miniscule part of an overwhelming trove of inculpatory evidence—a trove that included falsified export documents, dissembling emails, special machines that could circumvent anti-tampering seals, etc. And, at the center of it all was Torres—the conspirator-turned-state's-evidence who pulled the curtain back on the fraud and laid bare the scheme for all to see. In the face of all this, Bray's testimony about when he or his company (one of sixty such victims) first saw one fake document was thus patently inconsequential.

One last thing: The Defendants refer to the Suriname Tender Office as the "theme" of the Government's strategy, *see* Motion at 8, and say that the Government "made it a focus" of its case, Reply at 8. But that's really beside the point. The Suriname Tender Office *was* a focus of the Government's case precisely because the falsity of the STO representations was so unabashedly flagrant. The question here, though, isn't whether *the STO* was a "theme" or "focus" of the case; it's whether the timing of Bray's interaction with *this one purchase order* was a "theme" or "focus" of the case, and there's really no plausible way to suggest that it was.

Even so, at least two witnesses (other than Bray) testified about Tropical's purported tender from the Surinamese government, and the Government introduced several communications in which the Defendants could be seen discussing that tender (both amongst themselves and with the victim companies). The Defendants try to minimize the import of this evidence, characterizing it as irrelevant because the Government never connected the fake purchase orders to the victim companies' belief that the Defendants maintained a *bona fide* tender with Suriname. *See* Reply at 3 (arguing that the

purchase orders didn't exist in Mead Johnson's files before 2018 and, therefore, "could not have served as the representation that the [Suriname Tender Office] was a government agency"). The Defendants insist that the Government *couldn't* have established this connection because Tropical didn't draft the purchase order until late 2018—and because Tropical only drafted it at the behest of Mead Johnson, whose employees needed the record to justify its skyrocketing sales volume to MJ's auditors. *See id.* at 3 ("The Suriname Tender Orders were created by Tropical at the request of [Mead Johnson employees] to justify the volume of sales in Suriname and were intended to represent to [Mead Johnson] auditors in January 2019 all of the infant formula was sold to the Suriname government.").

In saying so, however, the Defendants are really just relitigating the defense they mounted at trial—that the victims were in on the thing from the start, that they had authorized the Defendants to resell their products in the United States, and that the Defendants had thus never "induced" anyone with fraudulent misrepresentations. But the jury rejected this defense, and it isn't this Court's role to second-guess that verdict. If what the Defendants mean to say is that, with the chronology of the purchase orders in hand, the verdict might've come out differently, then they had plenty of ways to put that chronology to the jury: They could have used the three documents they now rely on to cross-examine the Government's witnesses, including Bray; they could have called Silva or Special Agent Fielder to the stand and asked them about those documents; or, of course, they could've taken the stand themselves and testified that they hadn't created the fake purchase orders until 2018. Their decision not to do any of these things, though, proves one of two things: either they didn't believe that Bray was lying, or—lying or not—they viewed his testimony on this point as relatively immaterial. Either way, their *Giglio* claim fails.

*** 

32

Having carefully reviewed the Motion, the record, and the governing law, the Court hereby

**ORDERS and ADJUDGES** that the Motion [ECF No. 366] is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 20th day of July 2021.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record